IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | | |
|---|---|---|
| JIAN WYATT, HAO LI, YUDONG ZHANG, LI CHEN, | ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 1:23-cv-00742 |
| v. | ) ) ) | |
| | ) | COMPLAINT |
| | ) ) ) | |
| UNIVERSITY OF MARYLAND; DARRYLL PINES, in his official capacity as President of the University; JOEL DEWYER, in his official capacity as Director of Campus Life Operations; BRUCE PERRY, in his official capacity as Police Chief of Police Department at University of Maryland Baltimore Campus; WEIJIAN SHAN, individually, AKOURI-SHAN, LEEANN (a/k/a SHAN, LEEANN; CHAN, LEEANN;), individually, | ) ) ) ) ) ) ) ) ) ) | Jury trial demanded |
| Defendants. | ) ) | |

1.  The Plaintiffs, JIAN WYATT, HAO LI, YUDONG ZHANG, LI CHEN (hereinafter the "Plaintiffs"), by and through their undersigned attorneys, brings this Complaint against the above-named Defendants, and in support thereof alleges as follows:

**INTRODUCTION**

2.  The First Amendment protects the right of persons to express their opinions free from undue interference from governmental entities.

3.  This is a civil rights action brought pursuant to, *inter alia*, 42 U.S.C. § 1983 for declaratory and injunctive relief and monetary damages.

4.  The action arises from restrictions to and interference with the Plaintiffs in the exercise of their Constitutionally protected rights on public property, in that Defendants, individually or in concern, ignored and *de facto* cancelled a duly issued permit without cause or notice, stopped the Plaintiffs from hosting signs and posters, forced the Plaintiffs to repeatedly change the method of protest, and following

1

the Plaintiffs without legitimate reasons during their peaceful protests and picketing, thereof, on account of the exercise of the Plaintiffs' exercise of their First Amendment rights to freedom of speech, freedom of religion, and freedom of assembly and association in a public forum located in the defendant University of Maryland Baltimore Campus, located in the County of Baltimore, State of Maryland.

## PARTIES

5. Plaintiff Jian Wyatt (Plaintiff #1), a resident of Rockville, Maryland, is a naturalized U.S. citizen born and raised in the People's Republic of China (PRC) governed and controlled by Chinese Communist Party (CCP).

6. Plaintiff #1 holds the affirmative belief that CCP is the sources of all the evils and human disasters that have occurred or occur in the world and that taking down the CCP is the only solution to these disasters.

7. Plaintiff Hao Li (Plaintiff #2), a resident of Flushing, New York, is a citizen of PRC fleeing CP's control and seeking asylum protection from the United States.

8. Plaintiff Yudong Zhang (Plaintiff #3), a resident of Pasadena, California, is a citizen of PRC, lawful permanent resident of U.S., and unwilling to return to China due to the atrocious persecuting activities CCP imposed on his family.

9. Plaintiff Li Chen, (Plaintiff #4), a resident of Pasadena, California, is a citizen of PRC with lawful permanent residency in the U.S. who immigrated to the U.S. to avoid CCP's control and reign.

10. Plaintiffs #3 and #4 are husband and wife.

11. The Defendant, University of Maryland Baltimore County (UMBC), is a member of the University System of Maryland (USM), the state's public higher education system organized and existing under the Constitution and laws of the State of Maryland, that has its principal operations at 1000 Hilltop Circle, Baltimore, Maryland 21250.

12. Defendant Darryll Pines, at the time of the underlying incidents leading to this action, has been the President of the University Maryland. Defendant Pines is sued in his official capacity.

13. Defendant Bruce Perry is the Chief of the Police Department at UMBC and is sued in his official capacity.

14. Defendant Joel Dewyer, at all times pertinent to this action, is the director of Campus Life Operations at UMBC and is sued in his official capacity.

15. Defendant Weijian Shan, at all times pertinent to this action, is ostensibly the group chairman of Pacific Alliance Group (PAG), a Hong Kong based assets management company, and is sued in his personal capacity as the primary force behind other named defendants, and other unnamed co-conspirators, in coordinating, directing and guiding Defendants' efforts of interfering with the Plaintiffs' exercise of their Constitutional rights.

16. Defendant LeeAnn Akrou Shan, at all times pertinent to the action, is the daughter of Defendant Weijian Shan, and enrolled as a doctorate student at the Department of Psychology of UMBC, and is sued in her personal capacity as the primary force behind other named Defendants, and other unnamed co-conspirators, in coordinating, directing and guiding Defendants' efforts in interfering with the Plaintiffs' exercise of Constitutionally protected rights.

## JURISDICTION AND VENUE

17. This civil action arises under the First Amendment to the United States Constitution and 42 U.S.C. Section 1983.

18. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. Sections 1331 and 1343(a)(3).

19. The Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. Sections 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

20. The Plaintiffs' claims for damages are made pursuant to 42 U.S.C. Section 1983. The Plaintiffs' prayer for relief regarding costs, including reasonable attorneys' fees, is authorized by 42 U.S.C. Section 1988.

21. Venue is proper under 28 U.S.C. Section 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

22. Each of the Defendants maintains sufficient minimum contacts with the District of Maryland such that this Honorable Court may exercise personal jurisdiction over them.

## FACTUAL BACKGROUNDS

23. The Plaintiffs are Chinese citizens who sustained systematic suppression or persecution by CCP controlled Chinese government agents and officials when they lived in China.

24. After departing from China, Plaintiffs have continued to maintain a deeply held belief that the CCP is the source of much of the evil that happens in the world, and that the United States is the last safe haven from the atrocities of CCP on Earth.

25. On information and belief, based on various factors including his implausible story, the timing of his departure from China, his obvious favorable standing with the CCP, and reports from various former CCP agents, Defendant Weijian Shan is himself a CCP agent who has been operating in the United States for many years, and has maintained a close relationship with UMBC, and his daughter, defendant LeeAnn Akrou Shan, is an enrolled doctorate student at UMBC.

26. The Plaintiffs believe that it is their duty to express their anti-CCP position to UMBC students and let them know Shan family's CCP background and their influence at U.S. public schools, and moreover they have the Constitutionally protected right to do so.

27. On December 3, 2022, the Plaintiffs, along with other Chinese individuals, initiated a peaceful demonstration, protest and picketing at UMBC student center.

28. Plaintiff #1, on behalf of protesters including other Plaintiffs, communicated with Defendant DeWyer in early December 2022 regarding the protest and picketing on campus.

29. In response to the Plaintiff #1's communications at and around early December 2022, Defendant DeWyer possessed a favorable and positive attitude towards Plaintiffs intentions to conduct peaceful protests and picketing against defendants Weijian Shan and LeeAnn Shan.

30. Defendant DeWyer, with the knowledge that Plaintiffs intended to publicize Weijian Shan and his daughter's CCP background on campus, suggested that the Plaintiffs apply for a permit with UMBC to hold such demonstration at the "Commons" area ("the Commons") -- by paying $50 dollars per day, the

4

Plaintiffs and his companions would be provided with two tables and multiple chairs by UMBC for protesters to put signs, posters and flyers.

31. Situated in the middle of UMBC campus, the Commons is the hub of UMBC student life and the place for students to go before, between and after classes.

32. Plaintiffs were granted the permit by UMBC from December 5 to 12, 2022 for peaceful protests, demonstrations, and picketing at the Commons, and did engage the protest peacefully through that period when they were allowed by UMBC to hold anti-CCP signs, distribute flyers to students, and livestream through social media the protests at the Commons without any opposition from the school authority.

33. On January 13, 2023, in another jurisdiction and in a completely unrelated matter, a judge in the U.S. Bankruptcy Court in the District of Connecticut entered a Temporary Restraining Order prohibiting certain group of individuals from engaging protests at designated time and places. (A copy of the Order is attached hereto as "Exhibit A").

34. The Plaintiffs took no part in that case, they were not parties or witnesses in that case, and they were not aware of the case contemporaneously.

35. Additionally, the Plaintiffs believe that the January 13th Order, as written, does not apply to them or their protests at issue in this lawsuit.

36. Further, the Plaintiffs now believe that the wording of the January 13th Order is so vague and overly broad, that it is, on its face, unconstitutional.

37. The Plaintiffs applied to renew the protest permit with Defendant DeWyer on January 30, 2023 for another round of three-week protest and picketing at the Commons.

38. While the application was being processed, the demonstration and picketing continued at the Commons, and the Plaintiffs started experiencing some unexpected restrictions from Defendants.

39. Firstly, the Plaintiffs, as well as other protesters, were instructed to discontinue holding signs, distributing flyers and conducting livestreaming online.

40. Secondly, though allowed to be present near the Commons, Plaintiffs were demanded to engage their demonstration from a distance to the Commons where fewer students would be aware of Plaintiffs' activities.

41. Thirdly, on February 3, 2023, in the middle of the peaceful demonstration, a number of police vehicles and dozens of police officers arrived at the site, and gave orders, without explanation, provocation or justification, so as to compel protesters, including the Plaintiffs, to cease all demonstrations, and leave the Commons.

42. Protesters, including the Plaintiffs, were threatened by the police officers that they would be removed by force from the Commons if they did not follow the demand.

43. Without prior notice, and without being given any other alternative, the Plaintiffs, and their fellow protesters, were escorted by the police to a secluded area of the campus where they were instructed that they could continue their "exercise" of their 1st Amendment rights.

44. Despite the February 3 incident, on the very evening of that day, Defendant DeWyer, in his capacity as the director of Campus Operations, granted the permit for 19 days at the total fees of $950.00 allowing the protest on or about the Commons starting on February 6, 2023.

45. On February 6, 2023, Plaintiffs, and the other protestors, resumed the protest and picketing at the Commons without any interruptions from University officials and were able peacefully and freely to hold anti-CCP signs, distribute flyers about Shan family's CCP background, and conduct live broadcastings of their activities through social media platforms.

46. Upon information and belief, at some time on or before February 7, 2023, Defendant Shan made demand to the administration of the University to stop the Plaintiffs, and the other protestors, and as such conspired to deny the Plaintiffs the free exercise of their Constitutional rights.

47. On February 7, 2023, approximately around 11:00 AM EST, while engaging peaceful demonstration and protest at the Commons, the Plaintiffs and other protestors were handed a document which purported to be an "Order" dated January 13, from the Bankruptcy Court. This was done by two U.S. Marshalls.

48. The Plaintiffs, and other protestors, immediately expressed to the Marshalls that none of the protesters are the parties targeted by the TRO, thus they were not bound by the order.

49. Immediately after the U.S. Marshalls left, Defendant Perry and a number of police officers came to the Commons and ordered the Plaintiffs and the rest of the protestors to stop the peaceful demonstrations and leave the Commons immediately despite the fact that Plaintiffs were lawfully permitted to engage such protests at that place and at that time by UMBC.

50. Defendant Perry and other UMBC employees indicated that the Plaintiffs and the rest of the protestors were not allowed further protests at the Commons "because of the bankruptcy court order".

51. In the afternoon of February 7, after resume protesting and picketing at the Commons, Plaintiffs observed an unidentified drone fly around the Commons and circle Plaintiffs closely before it left.

52. UMBC has applied a strict campus rule of no operations of any drones are allowed on campus.

53. A couple of minutes after the unidentified drone left the Commons, four UMBC police officers arrived and demanded that Plaintiffs discontinue the protests, and threatened that if they would be arrested if they continue their activities.

54. Defendant Perry, and the other UMBC employees who threatened the Plaintiffs and the other protestors were not Federal enforcement agents.

55. In the evening of February 7, Plaintiff #1 received an email message from Defendant DeWyer with the attachment of an unsigned letter revoking the permit granted on February 3. Plaintiff #1 replied the email by asking the reasons for revoking the permit, which was not answered by Defendants. In the morning of February 8, 2023, upon Plaintiffs' arrival, twelve UMBC police officers were already present at the Commons and demanded Plaintiffs stop the protests, picketing and demonstration, and threatened with arrest of Plaintiffs if they would continue such activities at the Commons.

56. Defendant DeWyer handed Plaintiff #1 a copy of signed letter that she received through email in the evening of February 7.

57. As such, the Plaintiffs, under threat of arrest and under the auspices of a mystery order from a case in which they were not a party nor had any knowledge about, nor had a chance to challenge, and in which they were not named, was denied his Constitutional rights.

58. On February 14, 2023, Plaintiff #1 sent to Defendant Perry a letter reporting the drone incident on February 7 and expressing Plaintiffs' opposition to UMBC's restrictions to and interference of Plaintiffs' right of exercising 1st Amendment right at the Public School in Maryland.

59. In his response to Plaintiff #1's letter, Defendant Perry admitted that the unidentified drone was not authorized by UMBC and that an investigation case number was assigned to the incident (23-00025)

60. By the time the underlying complaint is being filed, Plaintiffs' 1st Amendment right has been *de facto* denied by UMBC, the investigation into the drone incident has not progressed.

## **WHY PROTEST, WHY PROTEST AGAINST THESE PEOPLE**

61. The government of the PRC, guided by a totalitarian ideology under the absolute rule of the CCP, deprives citizens of their rights on a sweeping scale and systematically curtails freedoms as a way to ensure its continued retention of power.

62. Moreover, it is clear that the United States is a particular target of this system.

63. Additionally, the CCP is particularly concerned with any dissident activity that seeks to expose the CCP.

64. Thus, it is apparent that the CCP has spies in the US.

65. There are also people in the US who actively oppose the CCP.

66. The Plaintiffs have on many instances joined with other like-minded individuals to protest against the CCP, in an effort to bring the rest of the world's attention to the numerous wrongful acts of the CCP.

67. It is not uncommon for people who undertake such efforts to expose the CCP's wrongful acts both within and without China, and it's less-than-friendly intentions for the United States, to become targets of the CCP for harassment, and worse, to discourage them.

68. In 2018, the U.S.-China Economic and Security Review Commission issued a landmark report titled "China's Overseas United Front Work." *See* Exhibit "B", Attached.[1] The report, an official US Government document, which is dated August 24, 2018, provides details regarding the efforts of the CCP to, *inter alia*, "carry out influence operations" in the United States, and elsewhere. *See* Id., at 3.

69. "It is precisely the nature of United Front Work to seek influence through connections that are difficult to publicly prove and to gain influence that is interwoven with sensitive issues." *See* Id.

70. "The CCP continues to lay the groundwork in the United States for United Front operations that could be similar to those that have achieved success in some U.S.-allied countries...." *See* Id.

71. "The CCP has…in certain instances has infringed upon – and potentially criminally violated – rights to freedoms of speech and association that are guarantees to Americans and those protected by U.S. laws." *See* Id. at 3-4.

72. The CCP under General Secretary Xi Jinping has put enormous resources into influence abroad, estimated at $10 billion a year.

73. Xi has elevated and expanded United Front activities, a so-called "magic weapon" that relies on coopting Chinese diaspora communities and building relationships with Western enablers to make the "foreign serve" the CCP. The CCP builds varied and long-term relationships. The PRC has a distinctive system that blurs the lines between classical espionage, clandestine operations, and influence-seeking.

74. Defendant Shan was set up by the CCP as an agent in plain sight, purportedly as a scholar and successful businessman. But scratching the surface reveals that the story does not add up.

75. If it could be believed at face value, Defendant Shan's official story makes him out to be the luckiest person alive, having always been in the right place at the right time, solely by dumb luck – as revealed in his autobiography.

---

[1] https://www.uscc.gov/sites/default/files/Research/China%27s%20Overseas%20United%20Front%20Work%20-%20Background%20and%20Implications%20for%20US_final_0.pdf

76. According to his own version of his personal history, at a time when the CCP heavily restricted the study of English in China, Defendant Shan just picked it up as a hobby – well enough to study at University in the United States.

77. At the time of the Cultural Revolution in China, when the chaos that gripped the country rendered people going so far as tribal-murder and cannibalism, Defendant Shan seems to have had little to say for his experience, as though it did not effect him at all.

78. At a time when travel outside of China was heavily restricted by the CCP, Defendant Shan went to America and studied in several of the best Universities, seemingly without any resistance or difficulty.

79. When Defendant Shan needed funds for those schools, benefactors and scholarships seemed to have appeared as if by magic right when they were needed.

80. When Defendant Shan met American politicians, he met the infamously Socialist and Communist-sympathetic of them.

81. Over the last several decades, while most ultra-wealthy Chinese businessmen eventually run afoul of the CCP (to the point of disappearing, or facing trial, and then disappearing), but not Defendant Shan. He has been miraculously untouchable. To maintain his street cred, Defendant Shan has even said a slightly negative utterance one time about the Chinese economy.

82. Meanwhile, numerous Chinese expats, defectors and former CCP members all have referred to Defendant Shan as the CCP's supreme agent in America.

## CLAIMS FOR RELIEF

### COUNT I

**Claim under 42 U.S.C. § 1983 for Violation of the Plaintiff' First, Fourth and Fourteenth Amendment Rights**

83. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 82 as if fully set forth herein.

84. At all times relevant to this Complaint, the Officers were acting under color of state law.

85. There is an inextricable nexus between the various Defendants, and as such all Defendants, public and private, are willful participants in depriving the Plaintiffs of their rights, and as such the Defendants have a symbiotic relationship for purposes of 42 U.S.C. § 1983.

86. As a result of this nexus, all acts by all the Defendants relate to Plaintiffs' claims under 42 U.S.C. § 1983.

87. All of the wrongful acts or omissions complained of herein against Plaintiffs were carried out by the named Defendants, and the unnamed Defendant officers, pursuant to:

   a. An explicit agreement among the Defendants to take steps against the Plaintiffs as one of the Chinese protestors against the CCP;

   a. A policy of the University of serving the interests of connected or influential individuals above others;

   b. The formal policies, rules, and procedures of Defendant University;

   c. Actions and decisions by Defendant University's policymakers to cooperate with in efforts at silencing Chinese who are critical of the CCP;

   d. Customs, practices so widespread and pervasive as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by University policymaking officials;

   e. Defendants' deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the University's failures, and the failures of the other policymaking agents, to train, supervise.

88. Any acts deemed to have been the result of negligence on the part of any of these Defendants are sufficient to support the Plaintiffs' 42 U.S.C. § 1983 claim.

89. As a result of the foregoing the Plaintiffs are now unable to resume the free exercise of their First Amendment right to protest as they had been doing due to fear of continued, or more intense, harassment.

90. As a result of the foregoing, Plaintiffs have suffered injuries and damages, and as such, the Plaintiffs claim compensatory damages for harm to the Plaintiffs, punitive damages, and additional compensatory damages based on value of constitutional rights, pursuant to which a jury is permitted to award damages based on its own unguided estimation of value of such rights.

## COUNT II

### Claim for violation of 42 U.S.C.S. § 1985(3)

### (Against All Defendants)

91. The Plaintiffs repeat and reallege the allegations in paragraphs 1 through 90 as if fully set forth herein.

92. The Defendants have engaged in a conspiracy to deprive the Plaintiffs, and indeed any of their fellow Chinese dissident protestors, of their Constitutional rights.

93. This conspiracy to deprive the Plaintiffs of their rights by virtue of their race and/or ethnicity, and was intended to prevent the Plaintiff from continuing to exercise their Constitutional rights.

94. The overt acts undertaken by these Defendants include but are not limited to:

   a. Agreement on the part of Defendants to serve the interests of the CCP – including silencing Chinese dissident protest in the US;

   b. Repeated instances of harassment, intimidation, and threats of arrest;

   c. As to the University, numerous overt acts were undertaken in furtherance of the conspiracy, including;

   　　i. colluding with Defendant Shan;

   　　ii. failing to identify themselves at the scene;

   　　iii. failing to file a report on the illegal drone on campus;

    iv. denial of repeated requests for assistance from the Plaintiffs;

    v. failing to properly train patrol officers to avoid infringement of Constitutional rights of protestors;

    vi. failing to supervise patrol officer to avoid infringement of Constitutional rights of protestors;

    vii. failing to monitor patrol officers with regard to interaction with agents of foreign powers.

95. Defendants were jointly engaged with the other Defendants, and as such were also acting under color of law for purposes of 42 USC 1985.

96. Defendants took action against the group of protestors, with which the Plaintiff are members, at the behest of the CCP.

97. Defendants took action against the group of protestors, with which the Plaintiffs are members, in retaliation for their protests.

98. The Defendants were motivated by racial animus against the Plaintiffs and their fellow protestors.

99. As a result of the Defendants various acts of wrongdoing the Plaintiffs have been harmed.

100. The Plaintiffs are suffering trauma from the aforementioned events. Not only is the harm suffered recoverable in its own right, it also now prevents them from exercising their rights.

## COUNT III

## Claim for First Amendment Retaliation Pursuant to 42 U.S.C. § 1983

### (Against All Defendants)

101. The Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 100 as if fully set forth herein.

102. The Plaintiffs' right to protest, and to speak out in public, are rights fully protected by the US Constitution.

103. The Defendants took the above-described actions when they were fully aware that the Plaintiff had previously protested against the Defendants and their connections to the CCP.

104. In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiffs of the rights protected by the First Amendment to the United States Constitution.

105. Defendants (a) retaliated against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, subjecting Plaintiffs to excessive force, in selectively enforcing laws and regulations against Plaintiffs, and in otherwise violating Plaintiffs' rights and engaging in the acts and omissions complained of herein.

106. Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's perceived protected speech and/or conduct.

107. Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected speech and/or conduct.

108. Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar conduct in the future.

109. As a result of the foregoing, Plaintiffs suffered injuries and damages.

110. The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that protected punitive damages should be imposed against them.

## COUNT V

### Failure to Intervene Pursuant to 42 U.S.C. § 1983

### (Defendant Perry)

111. The Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 110 as if fully set forth herein.

112. It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

113. Law enforcement professional are expected to swear an oath to uphold and defend the United States Constitution.

114. Upon information and belief, Defendant Perry took such an oath, and was therefore duty bound to uphold the United States Constitution, but failed to do so.

115. As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

116. Defendant Officers actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

117. As a result, Plaintiffs sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of Maryland.

## COUNT VI

### For Declaratory Judgment To Compel Registration As Foreign Agent

### (Defendant Shan)

118. The Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 117 as if fully set forth herein.

119. U.S. Congress enacted the Foreign Agents Registration Act ("FARA"), requiring "foreign agents" to register with the Attorney General.

120. As amended over the years, it applies broadly to anyone who acts on behalf of a "foreign principal" to, among other things, influence U.S. policy or public opinion.

121. FARA is an important tool to combat foreign influence in the United States. It creates transparency by requiring certain agents of foreign principals who are engaged in political activities or other activities specified under the statute to make periodic public disclosure of their relationship with the foreign principal.

122. One "who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control" of a foreign principal is required to register under FARA. 22 U.S.C. § 611(c)(1). 22 U.S.C. § 612(a) provides that "No person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement."

123. Indeed, the Plaintiffs request the Court accept the claim under 22 USC §611 et seq, on the grounds that the Court is not, strictly speaking, obliged to disregard the Plaintiff's claims due to an absence of an explicit "private right of action" provision in the FARA statute, since only District Courts have, as of yet, opined on the issue, and there has been no appellate or Supreme Court ruling on whether a private right of action under FARA can be inferred.

124. Pursuant to Supreme Court precedent this Honorable Court may grant this requested relief.

125. The Plaintiffs believe that such right of action must be inferred where, as here, there has been a lack of enforcement action -- resulting in the violation of constitutional rights, and a blatant disregard of the rule of law.

**CONCLUSION AND REQUEST FOR RELIEF**

WHEREFORE, Plaintiff claims damages of not less than $10,000,000, and respectfully requests:

a. The Court empanel a jury;

b. A declaratory judgment that Defendants must register pursuant to 22 USC 612;

c. An award of compensatory damages;

d. An award of punitive damages;

e. Additional compensatory damages based on value of constitutional rights, pursuant to which a jury is permitted to award damages based on its own unguided estimation of value of such rights;

f. The foregoing relief jointly and severally against all of the defendants in an amount in excess of the jurisdiction of all lower Courts;

g. An award costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

h. Such other and further relief as the court may deem just and proper.

DATED:     March 17, 2023

                                                Respectfully submitted
                                                for the Plaintiff

                                                /s/ Brian R. Della Rocca
                                                Brian R. Della Rocca, Esq.
                                                Bar No. 21781
                                                Compass Law Partners
                                                51 Monroe St. Suite 408
                                                Rockville, MD
                                                Phone: 240-560-3030
                                                Fax: 301-740-2297
                                                Email: bdellarocca@compass-law.com

/s/ Yongbing Zhang
Yongbing Zhang, Esq.
*Admission Pro Hac Vice Pending*
Law Offices of Yongbing Zhang
223 West Jackson Boulevard, Suite 1012
Chicago, IL 60606
Tel.: 312-750-9889
Fax: 312-750-9880
Email: yzhang@ybzlaw.com


/s/ Richard N. Freeth
Richard N. Freeth, Esq.
*Admission Pro Hac Vice Pending*
Freeth & Associates, LLC
260 Madison Ave., 8th Fl.
New York, NY 10016
Tel.: 917-775-7082
Email: rfreeth@freethfirm.com